## STATE ex SQUIRE v NATIONAL CITY BANK OF CLEVELAND

Ohio Appeals, 8th Dist, Cuyahoga Co

No 15397.   Decided April 23, 1936

John W. Bricker, Columbus, Charles F. Carr, Cleveland, Daniel E. Morgan, Cleveland, Andrews, Hadden & Burton, Cleveland, Day & Day, Cleveland, and John W. Eckelberry, for plaintiff in error.

Holliday, Grossman & McAfee, Cleveland, for defendant in error.

ROSS, PJ, MATTHEWS and HAMILTON, JJ, (1st Dist) Sitting by designation.

## OPINION

By MATTHEWS, J.

On the 15th day of June, 1933, the Superintendent of Banks of the State of Ohio took possession of the assets of The Guardian Trust Company, for the purpose of liquidation. Upon examining the records and assets of the bank, the Superintendent discovered that certain mortgages and notes in a separate file in the Mortgage Loan Department were marked with the legend "S T. 324," and that in the Trust Department there was a record entitled, "Sundry Trust No. 324," which manifestly had relation to the notes and mortgages bearing that legend. He also discovered among the assets of the bank a certificate purporting to evidence the right of the bank in its own right to participate in "Sundry Trust No. 324" to the extent of a certain amount expressed in terms of money. This certificate was in the following form and words:

"No. ........... $...........

THE GUARDIAN TRUST COMPANY
CLEVELAND, OHIO
PARTICIPATION CERTIFICATE
In First Mortgage Real Estate Loans

"This is to certify that ..............is entitled to a participation to the extent of ...........Dollars in the fund held by the undersigned in Sundry Trust No. 324, in its Trust Department, which fund the undersigned will make reasonable effort to keep invested at all times in loans on promissory notes drawing interest at the rate of six per centum par annum, payable quarterly on the fifteenth day of March, June, September and December of each year and secured by recorded first mortgages on real estate in Cuyahoga County, Ohio, the principal amount of said fund being at all times equal to the aggregate par value of participation certificates issued by the undersigned and outstanding against said fund; subject to the following terms, conditions and stipulations, to all of which the holder hereof by the acceptance of this certificate, assents and agrees:

"1. The undersigned shall at all times have and retain title to and possession, management and control of said fund and of the investment and reinvestment thereof, and shall have the arrangement of all details in connection therewith, as in its discretion seems best.

"2. On the twenty-sixth day of each March, June, September and December, the undersigned will distribute to the record holder hereof his proper proportion of all interest upon said fund received by it as of the fifteenth day of each said month, less its compensation of ......per centum per annum, computed on the principal sum represented hereby.

"3. The term of this certificate shall expire on the .........day of .........A. D. ......19.....; and upon giving written notice to the undersigned on or before the expiration of this certificate or of any renewal hereof, the record holder hereof shall be entitled after such expiration, to receive out of the principal sum of said fund, the amount represented hereby, as rapidly as the undersigned in due course of business receives a sufficient amount of 'principal from said loans, and in the order in which his written request for payment appears on the books of the undersigned among like requests made by the holders of like certificates of participation, and not otherwise, and upon the failure of the holder hereof to make request for payment in the manner and at the time herein stipulated, this certificate shall thereby become and stand renewed for the period of ......years from and after the expiration hereof, or from and after the expiration of any renewal hereof, as the case may be.

"4. The undersigned may deduct from the participation represented hereby and any interest accruing thereon, the holders' proper proportion of any loss, costs, damages, expenses and charges of every kind and description which may be incurred or sustained by the undersigned by or incident to said fund or any part thereof, which proportion the holder hereof promises and agrees to pay on demand if not deducted as aforesaid.

"5. This certificate is assignable only upon the books of the undersigned upon proper endorsement and surrender hereof to the undersigned for cancellation and is subject to redemption by the undersigned at any time upon mailing written notice of such redemption directed to the record holder hereof at his address last appearing upon the books of the undersigned after which this certificate shall cease to participate in the interest accruing upon said fund.

THE GUARDIAN TRUST COMPANY
Trustee
By ........................
Vice-President
........................
Assistant Secretary

Date of Issue ................ ......
Collectible after ..................
Countersigned:
By ......... .....................
Assistant Auditor."

Investigation disclosed that the Trust Department of the bank held many similar participation certificates in "Sundry Trust No. 324" in favor of itself as trustee for specific trusts.

It was disclosed by developments that persons outside the bank held some of these certificates.

The aggregate of all the certificates equalled the face value of the balance due on the mortgages identified by the legend "S T. 324," which at the time the Superintendent took possession totalled about $9,000,000.00. At that time certificates representing about 65% of the total value of the mortgages were owned by trust estates in the Trust Department of the bank, the rest being represented by the certificate called the "Float" certificate because of the purpose to which it was placed, in which the bank owned the beneficial interest, and by customers of the bank who had bought and paid for them.

No instrument evidencing the creation of a trust, and defining its terms between a settlor and the bank, was discovered, and it is admitted that none ever existed. The only instruments evidencing the terms of the trust were the participating certificates, a copy of which has been set forth, and they were all of uniform tenor mutatis mutandis.

The minutes of directors' meetings show no formal action of that board relating to the creation or acceptance of the trust.

It appears that the transaction which came to be known as "Sundry Trust No. 324" originated in 1907 as a facility in the investment of funds held by the bank as trustee and that its administration for more than twenty-five years to the closing of the bank was dominated by that original primary purpose, notwithstanding other customers seeking investments were permitted to purchase participating certificates.

On April 4th, 1933, prior to the taking of possession by the liquidator, The Guardian Trust Company, Trustee, had filed its petition in case numbered 389979 upon the docket of the Court of Common Pleas of Cuyahoga County for instructions, making various persons defendants to represent classes to which they belonged. Various persons were made defendants to represent the class of holders of matured or soon to mature certificates, who had made written requests for payment. Others were made defendants to represent holders of certificates that would not mature until late dates who had requested payment. Others were made defendants to represent such holders who had not requested pay-

ment, and still others were made defendants without regard to any class to which they might belong. The prayer of this petition was for instructions with reference to plaintiff's duties as trustee. These defendants filed answers and cross-petitions, setting forth their respective claims. Thereafter, The Guardian Trust Company, Trustee, and "Ira J. Fulton, Superintendent of Banks of the State of Ohio in charge of the liquidation of The Guardian Trust Company, and in so far as he has as such superintendent succeeded to any of the powers, rights, or duties of the Guardian Trust Co., as trustee of its so-called 'Sundry Trust No. 324," tendered their resignations in writing as trustees of "Sundry Trust No. 324" and requested the court to appoint a successor trustee to whom they could transfer the funds and properties constituting said "Trust Fund."

On the 23rd day of July, 1933, the cause came on to be heard upon the cross-petition of Thalia R. Fuller and others and their prayer that a successor trustee be appointed, as well as upon the resignations of The Guardian Trust Company, Trustee, and Ira J. Fulton "in charge of the liquidation of The Guardian Trust Company;" and the court found upon the evidence that the action was properly a class action, accepted the resignations and appointed The National City Bank as successor trustee and provided for the transfer of the assets of "Sundry Trust No. 324" to it.

On August 30, 1933, which was after the Superintendent had taken possession for liquidation, Irene Sepessy filed an action in the Court of Common Pleas of Cuyahoga County against The Guardian Trust Company, Ira J. Fulton, Superintendent of Banks of the State of Ohio, Frank R. Hanrahan, Special Agent in charge of the liquidation of The Guardian Trust Company; The National City Bank, Thalia R. Fuller and John H. Quale. In her petition she alleged that she was a depositor in The Guardian Trust Company at the time that the Superintendent took possession, "and as such is interested in the distribution of the assets of the company; that plaintiff brings this action not only in her own behalf but on behalf of all the depositors of The Guardian Trust Company, all of whom have a like and common interest with the plaintiff in seeking and obtaining the relief prayed for and that the number of said depositors is too great to permit all to be brought before the court, the number of the depositors amounting to more than one hundred thousand." She also averred

that Thalia R. Fuller and John H. Quale were holders of substantial amounts of the participating certificates and that she sued them "as representative of the entire class of participating certificate holders, all of the members of said class having a like and common interest with said defendants Thalia R. Fuller and John H. Quale, in said participation provided for by said certificates in said real estate loans." And after setting forth in considerable detail the facts as she understood them relating to the creation, constitution, and administration of "Sundry Trust No. 324" showing that the property was at all times under the complete control of the bank, she alleged that The Guardian Trust Company was without right or power, lawfully to secure such deposits by the pledging of its funds or creating of preferential rights therein, as was attempted to be created by and through the issuing of said participation certificates; that the transactions by which said bank undertook to issue such participation certificates in return for deposits of funds by the holders thereof, and to secure the same by attempting to segregate certain of its banking assets for the redemption of said certificates, were at all times against public policy, and that in fact the holders of said participation certificates have no other or greater right in said notes, bonds and mortgages held and segregated under the said so-called "Sundry Trust No. 324" than have the other general depositors in said bank, all of whom have a like and common interest with the plaintiff in having the entire assets of said bank liquidated and distributed equally and ratably among the depositors thereof."

The plaintiff then alleged that The Guardian Trust Company, Ira J. Fulton, Superintendent of Banks, and his agent, Frank R. Hanrahan, in charge of the liquidation of said bank, well knowing the facts, were uniting with the other defendants to surrender said notes, bonds and mortgages to The National City Bank to collect and liquidate them for the exclusive benefit of the certificate holders, and she closed her petition with a prayer for specific and general equitable relief necessary to preserve and restore the property to the Superintendent of Banks for liquidation, for the equal benefit of all depositors including the certificate holders.

The National City Bank answered setting forth the facts relating to Sundry Trust No. 324, as it understood them, and also the proceeding and order in case numbered 389979, heretofore referred to, al-

leged that all of said property had been delivered to it in accordance with said order, and that it was engaged in liquidating the assets under the order of the court, and denied all other allegations.

The defendants, The Guardian Trust Company and Ira J. Fulton, as Superintendent of Banks of the State of Ohio in charge of the liquidation and Frank R. Hanrahan, Special Agent in charge, filed a joint and several answer, admitting the allegations of the existence of Sundry Trust No 324, admitted the allegations relating to the number composing the class of depositors and certificate holders, and that plaintiff was a depositor, and that the defendants, Fuller and Quale were certificate holders, affirmed the validity of Sundry Trust No. 324 as a trust and that the assets composing it had been properly delivered to The National City Bank in accordance with the order of the Court of Common Pleas, denied all other allegations, and asked that the petition be dismissed.

After other pleadings and amended pleadings had been filed fully presenting the issue of the rights of the parties in relation to the assets identified as Sundry Trust No. 324, the cause came on for final hearing upon that issue on December 7th, 1933, and after hearing evidence offered on behalf of the plaintiff, the court, after hearing arguments, sustained the motion of the defendants for judgment in their favor and for the dismissal of the plaintiff's petition. This decision was journalized on December 18th, 1933. By that entry, the court found "upon the plaintiff's said evidence, that she is not entitled to the relief prayed for in her said petition" and for that reason adjudged and decreed that "The plaintiff's petition is hereby dismissed at her costs. It is further ordered that the defendants recover of said plaintiff their costs in this action."

That judgment remains unreversed and unmodified. Thereafter, counsel fees were allowed in the case to the defendants' counsel, for defending the trust.

The National City Bank, as successor trustee, acting under the orders of the court took possession of the assets, received the surrender of the participation certificates issued by The Guardian Trust Company and issued its own participation certificates in lieu thereof, proceeded to liquidate the assets and had paid over $3,000,000.00 to the holders of certificates when the action here under review was filed on June 13th, 1935, more than eighteen months after the judgment was rendered

in the Sepessy case by the State of Ohio on relation of the Superintendent of Banks probably moved by the doubt created by the decision in **Ulmer v Fulton**, 129 Oh St 323, decided on April 24th, 1935, as to the correctness of the conclusions reached as to the validity of Sundry Trust No. 324 as a trust. In his petition, the Superintendent set forth at considerable length the history of the creation and operation of Sundry Trust No. 324, as he understood them, alleged the legal conclusion that the laws of Ohio did not empower a bank and trust company such as The Guardian Trust Company to act in the dual capacity of settlor and trustee by creating trusts out of its own securities and selling participating certificates therein to the public, all of which The Guardian Trust Company did or attempted to do in creating and administering the so-called Sundry Trust No 324, and that "Such undertakings are opposed to sound public policy and are invalid." As was natural, the pleader emphasized the points of factual resemblance between the trusts involved in Ulmer v Fulton, supra, and Sundry Trust No. 324, and then denounced the validity of the latter trust for the same reasons given by the Supreme Court for holding the former trusts invalid. The plaintiff after alleging the transfer of the assets of Sundry Trust No. 324 to The National City Bank as successor trustee under the erroneous belief that such assets constituted a valid trust in favor of the participation certificate holders, his demand for the return of such assets to him and the refusal of The National City Bank to comply, prayed for a declaration of the invalidity of Sundry Trust No. 324 as a trust, and that the defendant be required to restore the assets or their proceeds to the relator, and for injunction and such other relief as he might be entitled to in the premises.

The defendant, by answer, affirmed the inherent validity of Sundry Trust No. 324, as a trust in favor of the participating certificate holders and alleged the judgment in the case of Irene Sepessy v The Guardian Trust Company, et al, as a bar to this action; likewise alleged the order appointing it as successor trustee in the case of The Guardian Trust Company, Trustee, v The Forest City Motor Car Company et al as res adjudicata and estoppel based on the acts of the Superintendent in the judicial proceedings and likewise, also that the transaction was a completely executed transaction and therefore unassailable, also that if Sundry Trust No. 324

was invalid as an express trust, equity would raise a resulting or constructive trust upon its ruins, and finally that on acocunt of the approval of the Superintendent of Banks during the years and the reliance thereon by the public as valid trusts to now declare them invalid would deprive the participating certificate holders of their property without due process of law.

At the trial the evidence revealed in great detail the circumstances surrounding the creation of Sundry Trust No. 324, and its history from that time to the closing of the bank. The court found for the defendants upon the evidence and rendered judgment accordingly. It is that judgment that is now under review by way of appeal, but upon the same evidence.

The trial court, treating the original issue as still unadjudicated, sustained the validity of the title of the participation certificate holders to the assets, although also stating that "We believe the conclusion which we· have reached might have been reached upon the ground of estoppel, as well as upon the doctrine of res adjudicata." The opinion of the trial court covers at great length the facts and law relating to the original equities of the participation certificate holders. We do not question the soundness of the conclusion reached in favor of the certificate holders, but we are of the opinion that it was not an open question in this case. We find that the issue as to the validity of the trust was. resolved in favor of the trust by the judgment in the case of Irene Sepessy v The Guardian Trust Company, supra, and also by the order in the case of the Guardian Trust Company, Trustee, v The Forest City Motor Car Co., et al, supra, and that either of these adjudications would be sufficient to estop him from relitigating the issue. As we place our affirmance of the judgment upon that ground we have not developed in this opinion the facts showing the dissimilarity between the facts relating to Sundry Trust No. 324 and the facts relating to the trusts under consideration in Ulmer v Fulton, supra. It is manifest that there are important differences. We have set forth, we believe, sufficient facts to show the applicability of the law which we think governs the case.

That the issue in the two prior cases (the Sepessy and The Forest City Motor Car Co. cases) was the same as in this case and that all parties to this case were likewise parties or represented by parties to those cases, seems clear. They were admittedly bona fide adversary proceedings. That the judgments rendered therein were conclusive upon the parties and not open to collateral attack seems clear unless the court lacked jurisdiction to render them;—and that is one of the contentions of the plaintiff and the only one which, in view of the basis of our decision, we consider necessary to discuss.

Counsel for the plaintiff in error say that "Liquidation proceedings under §710-89, GC, et seq, place the administration of an insolvent bank exclusively in the hands of the Superintendent of Banks as an administrative officer of the State, not subject to the jurisdiction of the courts except as provided by statute," and, further that it is expressly provided by §710-95 GC that "He shall not be directed or restrained in the exercise of his powers or discretion otherwise than in a suit in equity in which it shall be alleged and proved that he has exceeded or abused such powers and discretion."

It is true that the Superintendent of Banks is an administrative officer. In determining the extent of judicial review of his acts the principles of administrative law must be resorted to, in construing specific statutory provisions for review.

In the first place, under the American system of separation of powers the door to judicial review of the acts of administrative officers cannot be completely closed. This doctrine of the separation of powers is clearly implied in both the federal and state constitutions, and has been affirmed so frequently by the highest courts as to require no citation of authorities at this late date. Notwithstanding this doctrine, an admixture of governmental powers may be conferred upon an administrative officer or board provided there is no delegation of actual legislative power and no complete surrender of judicial review. To attempt to confer absolute uncontrolled power upon any officer or board would involve an abdication by both the legislative and judicial departments which would be·unconstitutional and void. The quality of complete finality cannot be conferred upon the decision of an administrative officer. When the legislature confers power upon an officer it must set limits, state rules or intelligible principles by which he is. to be guided and controlled. If it does not the statute lacks the essentials of a law and is void. J. W. Hampton & Company v

United States, 276 U. S. 394; United States v L. Cohen, Grocery Co., 255 U. S. 81; Harmon v State, 66 Oh St 249; 8 Ohio Jur. 315 et seq.; United States v Schechter Corp., 295 U. S. 495. And if the legislature establishes the laws or rules by which the officer is to be guided it is the essence of judicial power to hear and determine whether there has been a violation of such rule or law. That power cannot be delegated to the administrative officer, 8 Ohio Jur. 328, and 329. Absolute power or discretion cannot be conferred. Complete administrative finality is impossible under the constitution, 38 Harvard Law Review, 449; 30 Yale Law Journal, 781; 29 Mich. Law Review 839; Crowell v Benson, 285 U. S. 22.

No matter how broad the statutory language conferring power upon an administrative officer may be, if he ignores the law enacted to control his action, a person whose private right is violated thereby may seek his remedy in the judicial court of appropriate jurisdiction. And where discretion is lodged in such officer there is an implied term in all such legislative enactments that such discretion will be exercised in a judicious manner, and not arbitrarily or capriciously. The arbitrary or capricious exercise of power by an administrative officer offends against the due process clause of the federal and state constitutions. It was in recognition of this principle that the legislature incorporated the express provision that the courts would correct wrongs committed by the Superintendent by abusing his discretion or exceeding his power. §710-95, GC.

It is manifest that with this limitation it was the intention of the legislature to confer upon the Superintendent of Banks broad powers in the liquidation of insolvent banks, but nevertheless provided that when his action was challenged recourse could be had to the court by the aggrieved person. §§710-91, 710-92, and 710-95, GC.

That the banking business has long been regarded as affected with a public interest is indisputable. Noble State Bank v Haskell, 219 U. S. 104. It comes within the sovereign regulatory power, Ohio has exercised this power in many ways. It (the banking business) cannot be carried on except by permission of the state and is subject to constant inspection in order that it may not be so conducted as to be detrimental to the general welfare. This visitorial power has been reposed in the political departments, and the extent to which it shall be exercised rests exclusively in the legislature— the policy determining department of the government, and when the administrative officer exercising the power stays within the power conferred upon him, he is beyond judicial control, because his actions conform to the intention of the legislature to which the constitution has given the authority to determine all matters of policy.

However, when the policy has been determined and a bank is permitted to operate, vested rights arise in favor of those dealing with it. Contract rights are created in favor of depositors and others, and proprietory rights in property in the possession and control of the bank arise. The owners of these rights and titles are entitled to have recourse to the courts for their enforcement and protection. So long as the state permits the bank to operate as a bank, any claimant may maintain an adversary proceedings against it to the same extent that he could against any other defendant. He cannot, of course, usurp the visitorial power of the state, and that, and only that, was the decision in State ex Bettman v Court of Common Pleas, 124 Oh St 269. In that case the Common Pleas Court was prohibited from appointing a receiver for a building and loan association, and thus suspending its operation as a building association. notwithstanding the superintendent of building and loan associations— the officer charged with the duty of determining whether such institution should remain in operation—had authorized it to open and had never revoked the permit, but was at the time investigating its condition, as was his duty, to determine what course he would pursue with reference to it— whether it should be permitted to continue to exercise its corporate powers or he should take possession of its assets for liquidation for the benefit of all having rights—contractual or proprietary—against it. The court said at page 277:

"These facts are uncontroverted, and there being no charge of failure, neglect, or delay of the superintendent of building and loan associations, or of the attorney general, in the performance of their duties prescribed by law, the presumption, of course, obtains that they have been and will continue to be diligent in the performance of all the duties and faithful in meeting all the responsibilities of their respect-

ive offices relative to the affairs of said company."

The court had already pointed out, at page 273, that the relator challenged the jurisdiction of the Common Pleas Court to hear the issue with respect to the appointment of a receiver, and said "He does not seek to restrain or limit the hearing and determination of any other issue presented in that case."

When a statute confers supervisory powers upon an administrative officer over a business affected with a public interest and authorizes and requires such officer to take charge for liquidation purposes upon insolvency, there can be no basis for the appointment of a receiver, unless and until it is made to appear that such officer is not performing his duty. If he is performing his duty he will take charge and preserve the assets, and that would be all that any receiver could do. As viewed by the majority of the court, the application for a receiver was in defiance of this right of the superintendent, and the Common Pleas Court intended to hear and determine the question as though no such right had been conferred upon the superintendent. Until it appeared that the Superintendent was derelict in his duty, the assets could not be in jeopardy, and that is the only basis for the general equitable receiver which was sought in the case. And for the court to announce in advance that it would disregard the law conferring such administrative authority upon the superintendent, and that it intended to usurp such authority through the appointment of a receiver, was the basis upon which the Supreme Court awarded the writ of prohibition, so that the co-ordination of the different departments of the government contemplated by the constitution would be maintained.

The court expressly withheld any expression on the subject of the right to sue on failure of the superintendent to "promptly, fully and faithfully perform" his duty.

The dissenting judges in that case were of the opinion that the statute did not give to the Superintendent the exclusive authority to liquidate insolvent associations, and that under the constitution the legislature had not the power to thus limit recourse to the courts by one aggrieved.

The case of **The Commercial Bank & Savings Co. v The Woodville Savings Bank Co., 126 Oh St 587,** is relied upon for the proposition that the jurisdiction of the Superintendent of Banks is exclusive. The pronouncement in that case as in all other cases must be read in the light of the facts. It was an action in foreclosure of a mortgage upon real estate which The Commercial Bank & Savings Co., had purchased from the mortgagor subject to the mortgage, and had agreed to pay the mortgage, interest, taxes and assessments. The action in foreclosure was filed by the mortgagee after the superintendent of banks had taken possession, and as a third cause of action it was alleged that the superintendent had collected rent and had not paid the taxes. The prayer was for a foreclosure and an accounting of the rents collected, the allegation having been made that the condition of the mortgage had been broken and that the property was wholly insufficient to pay the mortgage debt. It was conceded that the foreclosure action was maintainable, and it proceeded to a sale of the property, and after taxes and costs were paid the residue was insufficient to pay the mortgage debt. That left for consideration the question of whether the mortgagee was entitled to the rent collected by the superintendent in the process of liquidation and before any demand or suit had been filed by the mortgagee. All the court decided was that he was not entitled to the rent. In the course of reasoning the court said that the jurisdiction of the superintendent was exclusive "except insofar as it is limited by §710-101, GC," which by its terms recognizes that a court may appoint a receiver but that the superintendent may supplant such receiver within five days after receiving notice of such appointment. That right would prevent the mortgagee from effectually asserting the remedy by which he could have the rents collected and held for his benefit. Without such remedy there could be no right to the rent. For that purpose the jurisdiction of the superintendent was exclusive, but if the court had meant that the possession of the superintendent was a sanctuary which no judicial officer dare invade, it would have denounced the entire foreclosure proceedings as beyond the jurisdiction of the court. That it did not do.

The provision in §710-91, GC, that the superintendent shall post notice of the fact when he takes possession, and that "Such posting shall also operate as a bar to any attachment, garnishment, execution or other legal proceedings against such bank, or its assets and property, or its liabilities" was designed to protect the superintendent in the possession of the assets of the bank by furnishing him with a defense to actions

against the bank, its assets and property. It has no application to an action based on the disregard of vested rights by the superintendent himself in the liquidation of the bank, or to actions instituted by the superintendent, or to actions instituted by others against him in which, for reasons deemed sufficient by him, he does not see fit to plead the defense but chooses to submit the issue to the court.

When the superintendent takes charge for liquidation, he is given no authority or power to disregard any vested right. He takes possession of the property subject to every conventional and proprietary right against it. If he seizes property not belonging to the bank, he must relinquish it, and must administer the rightful property of the bank for the benefit of those entitled. He cannot disregard any of these rights and titles without exceeding his powers and abusing his discretion. All these limitations are recognized in §710-95, GC, and the superintendent of banks is given adequate authority to so administer his trust as not to transgress them. By paragraph 4 of that section he is authorized to "settle, compromise or compound any debt owing to or held by such bank" by paragraph 10 he is empowered to "institute, prosecute, and defend any and all actions or proceedings within or without this state, and to execute, acknowledge, and deliver any and all deeds * * * necessary and proper," and then "without prejudice to or limitation" of powers previously conferred in the section, he is given further powers, to be exercised under the order of the court in which the liquidation proceedings are pending to "surrender or abandon any asset, which he considers of no advantage to creditors, including choses in action, whether the subject of pending litigation or not, and reject or disclaim any lease or contract, which he considers burdensome." And it is clear from the remaining provisions of the section that the action of the superintendent whether made under the order of the court in the liquidation proceedings or not, is not final so far as the right of any aggrieved person is concerned.

It seems to the court that the legislature by the provisions of that section not only preserved the essential constitutional right of review to those claiming vested rights, but by requiring the approval in advance of the court in which the liquidation proceedings are filed of contemplated action in certain respects has attempted to

further safeguard against abuse of power or discretion on the part of the superintendent, without binding the aggrieved person by either the action of such court or superintendent. And the only limitation placed upon the right of the aggrieved person to recover in an independent action is that the superintendent shall not be directed or restrained, that is, enjoined, "in the exercise of his powers or discretion otherwise than in a suit in equity in which it shall be alleged and proved that he has exceeded or abused such powers and discretion."

While there are limitations placed upon the bringing of actions when the superintendent has acted under the order of the court having jurisdiction of the liquidation proceedings. at no place has the legislature attempted to ban all actions, or to determine the court in which all permitted actions should be instituted.

Therefore, clothed with the power of the bank itself and this statutory authority the superintendent could administer its assets and make adjustments in the exercise of a judicious discretion. If a bona fide dispute existed, he was clothed with power, to compromise. If he came into possession of assets claimed by another he could investigate and if he reached a conclusion in good faith upon evidence that the claim was valid it was within his power to recognize it, surrender the property and bind the bank and its depositors by his action. He and they would be bound or estopped by such action from taking a contrary position at a later date. So in the case at bar if the superintendent exercised his discretion in good faith and surrendered Sundry Trust No. 324, believing that, under the circumstances, the holders of participation certificates were the equitable owners thereof, his action in so doing was conclusive regardless of whether it was sanctioned by the order of any court, provided only that there was evidence upon which his conclusion was sustainable, provided he acted in good faith.

On the other hand, if the superintendent failed to act judiciously or in good faith or surrendered the assets of Sundry Trust No. 324 under a mistake of law, and, therefore, exceeded his powers, his action would not be binding upon the bank or its depositors, and each according to the express provisions of §710-95, GC, and under the Constitution itself, could have recourse to the court to protect the rights violated by his action.

We find that Sepessy v The Guardian Trust Company et al and The Guardian Trust Co. v The Forest City Motor Car Co., cases were appeals to the equity jurisdiction of the court and conformed to the exact language of §710-95 GC. We are also of the opinion that under the constitution these actions could have been maintained under the circumstances without specific statutory authorization in any court upon which jurisdiction has been conferred of that class of cases and that the Court of Common Pleas having general jurisdiction in both law and equity had jurisdiction to hear and determine these cases and its judgments therein were binding and conclusive upon the parties thereto.

For these reasons, we find in favor of the defendant, The National City Bank and a decree in its favor denying to the plaintiff the relief sought by him may be presented.

ROSS, PJ, and HAMILTON, J, concur.