L. A. ANDREW, State Superintendent of Banking, Appellee, v. FARMERS & MERCHANTS STATE BANK, WASHINGTON, et al., Appellants.

MARCH 13, 1928.

*Hanner, Flick & Powers* and *Ray Yenter*, for appellants.

*Ben J. Gibson*, Attorney-general, *E. D. Morrison, Schuyler Livingston*, and *Clark & Byers*, for appellees.

MORLING, J.—The principal question argued is whether the settlement is in the interest of the depositors. The receiver, while filing a general denial, and setting up his reasons for the settlement, further in answer asked:

"If there is any just, valid, or legal reason for holding that the same is not a good settlement, and not for the best interests of the depositors, that then the court make such orders in the premises as will restore it *status quo.*"

On the face of the guaranty, the directors apparently guaranteed payment of bills receivable amounting in the total to $394,775.63, of which $270,984.26 is classified as doubtful. The amount now claimed on the guaranty is $256,943.33. Before the bank closed, the directors had deposited their notes for upwards of $81,000, for the purpose of carrying through a merger with another bank, and had agreed to a stock assessment. They appear to have property subject to execution approaching in value the amount of the guaranty. The settlement made and approved was for $36,000. Over against this startling contrast are the facts that the application is made by only five depositors. The total number of depositors and the total amount of deposits do not appear, further than that, at a depositors' meeting, 200 to 250 are said to have been present, and the receiver asserts in argument (apparently with the acquiescence of applicants) that the total amount of deposits is $470,000. The deposits of the five applicants are $10,720.79. The settlement was approved by the five members of the depositors' committee (acting in this respect, however, individually, but apparently with the acquiescence of all depositors except applicants). It was approved by the examiner in charge, by the banking department, by the attorney-general, and by the court *ex parte*. Judge Kelley, of the twelfth district, was specially assigned to

hear the present application, and after a trial, announced not only his concurrence in the ex-parte order, but also affirmatively his conclusion that it was for the best interest of all concerned that the settlement be allowed to stand.

Applicants complain that the trial court did not pass upon the validity of the guaranty. At the time of the settlement, the directors claimed that the guaranty was without consideration. The settlement was approved December 2, 1924. The order of confirmation entered on the trial of this proceeding was made December 4, 1926. Our opinion in *In re Estate of Prunty*, 201 Iowa 670, handed down March 16, 1926, determining that in such a case there is a sufficient consideration, seems not to have come to the notice of the parties or the trial court. That case has recently been followed in *Hills Sav. Bank v. Hirt*, 204 Iowa 940. Under the rule of those cases, there was a sufficient consideration for the guaranty; but the question was an open one when the settlement was made. Though the guaranty is valid for such liability as can be proved to come within its terms, the question remains whether the settlement made upon it is in the interest of the depositors. The validity of the covenant of the guaranty on its face is but one factor. Abstractly, it may be valid and actionable. Concretely, the question still is, What amount of recovery upon it, if any, is warranted by the facts?

The guaranty is dated December 27, 1922. It recites an examination of the bank, from which the superintendent of banking and examiners had expressed the "opinion that the following described bills receivable or other assets of the party of the second part are of doubtful value. (A list of said assets being attached hereto, and identified as Exhibit A.)" In terms, the directors "severally hereby guarantee payment on or before three years from this date of each and every said bills receivable or any renewals of the same, and hereby waive notice of the acceptance of this guaranty and agree that this guaranty shall continue in full force and effect until the bills receivable or renewals thereof have been fully converted into cash." Exhibit A of the guaranty is made in three columns: the first headed "Name of Borrower," the second, "Total Amount in Bank," and third, "Amount Doubtful." There are some 42 borrowers listed, the amounts against them ranging from $75 up to $35,723.52. Most of them are large amounts. As illustrations,

we may take the following items opposite the names of different borrowers: One item shows total amount in bank $3,500; amount doubtful, $2,000. Another item shows the total amount in bank $6,037.80, amount doubtful, $6,037.80; another, total amount in bank $22,929.42, amount doubtful, $12,000; another, total amount in bank $35,723.52, amount doubtful, $35,723.52. Some 22 of the items have the same amount in both columns. That is, the amount doubtful is the same as the total amount in the bank. These aggregate some $175,000. The footing of the items in the column headed "total amount in bank" is $394,775.63. The footing of the doubtful column is $270,984.26. An appendix to the agreement, added before signing, provides:

"That when any of the above bills receivable listed in Exhibit A and classed as doubtful have been or are eliminated from the published assets of the Farmers & Merchants State Bank, Washington, Iowa, either by cash, assessment, charging same to undivided profits or surplus reduced to undivided profits or by securities acceptable to the superintendent of banking said guarantors whose signatures are attached hereto, shall be released from payment of bills receivable as are eliminated in the above mentioned manner. Guarantors further reserve the right to exercise any of above mentioned methods to eliminate such doubtful bills receivable and that if an assessment is agreed upon same will be enforced as per the statutes of this state."

A question which to the court seems quite determinative receives but little attention from appellants in argument. That is, in applying the guaranty to the bills receivable of the bank, upon what ones and in what amounts would the receiver be entitled to recover of the guarantors? The applicants went into the subject with great thoroughness, by means of an audit made by a firm of certified accountants. These accountants returned to applicants an elaborate report, consisting of 13 pages of comments and explanations and nearly 300 pages of details of all notes found in the bank of borrowers named in Exhibit A to the guaranty. The report contained topical summaries, and also a general summary, consisting of three pages of notations and 22 columns of results of the examination with respect to each borrower. The guaranty is dated December 27, 1922. The bank closed April 28, 1924. The auditor's report to applicants is made as of May 31, 1925. In this report it is said:

"We made no application of payments, so as to show only the net amount open, or to show such of the most recent notes that would make up such net amount, but show, in every case, all the loans and all the payments which result in the note which we were tracing.

"All the loans that were yet open on the date of this report, with the exception of those that were considered good and collectible, have been handled as outlined above, but there were cases in which persons, whose open loans were traced, had other loans during the period with which we have not concerned ourselves."

The report quotes from the instructions of applicants' attorneys as follows:

"'Secure a list of the notes as attached to the bond which was given by the directors in December, 1922. Take each note and follow it through the records of the bank so you will be able to testify exactly as to the disposition that has been made of each note.

"'Trace, as far as possible, the origin of all of the notes listed in the guaranty bond, that is, how and when they came into the assets of the bank.

"'Make your report in such form that the same will be on separate sheets as to each note with the names of any witness or witnesses that would be needed to establish the facts embodied in your report.'"

The report then proceeds:

"As a matter of fact, the list attached to the bond proved to be, not a list of individual notes, but a list of lines of credit, each one of which was made up of from one to ten notes. In consequence it was necessary for us to search through the old Liability Ledger sheets for all notes that were open on each particular line on December 20, 1922, before we could establish a list of notes that would be in agreement with the existing list of lines of credit. This list is set out as a part of Exhibit A. Opposite each borrower's notes has been placed the amount of his line of credit, or in the language of the agreement, the 'Total Amount in Bank.' In all cases, loans which were open on December 20, 1922, were found to exactly equal the 'Total Amount in Bank' except in the four instances noted on the exhibit. Also, set out on Exhibit A is a column totaling $270,984.26 which

is made up of amounts referred to in the agreement as being the 'Amount Doubtful.' ''

Here follows a reference to the report of objectionable assets made by the examiner in charge. The auditor's report then proceeds:

"We have not attempted to designate which of the open notes are renewals of notes guaranteed in the agreement of December 27, 1922. To make such a determination would, except in a few cases, be an extremely difficult and involved task, even with the exhibits and schedules now available, and we call attention to the fact that no one could have formed a dependable conception of what amount of guaranty notes were open on any date very far removed from December 20, 1922." (Here follows an illustration.)

The detail sheets sustain this conclusion.

Applicants have not introduced evidence or pointed out how from the detail sheets the "extremely difficult and involved task" referred to by their accountants can be performed, or how anyone can form "a dependable conception of what amount of guaranty notes were open on any date very far removed from December 20, 1922,"—that is to say, when the accountants made their examination, or when the hearing now reviewed was had, how could then, or how can it hereafter, be ascertained what notes in the bank are within the terms of the guaranty? The accountants seem to have had the advantage of everything that would help solve the problem. One of them testifies (referring to summaries) :

"Column 10 is a listing of increases in the lines of credit subsequent to December 20, 1922. The total increase in the lines is $28,415.91. These are increases over and above the total line of credit set out in the guaranty, the increases being made subsequent to the date of the guaranty.

"Column 11 is a listing of the balance of the total lines of those debts remaining unpaid May 31, 1925, and amounts to $258,833.33.

"Column 12 contains a listing of the balance of the items listed as doubtful in Exhibit A attached to Exhibit 1 as of May 31, 1925, leaving a balance of $188,433.99.

"Column 13 contains a listing of three items to which the examiner in charge, Mr. Morrison, takes exception for the reason

that his records are not entirely clear or do not entirely agree with our setting up of those items.

"Column 15 contains a statement of the items paid in these lines of credit from June 1st to November 30, 1925, inclusive, the amount being $3,350.

"Column 16 shows the balance remaining unpaid November 30, 1925, of the total line without regard to whether doubtful or not, including increases as shown by the liability ledger and aggregates the amount of $256,943.33.

"Column 18 contains a detailed listing of the payments from the date of the guaranty up to November 30, 1925, applying the payments to the doubtful items. That totals $102,788.73.

"Column 19 contains a repetition of the detailed listing of notes charged off in one aggregate sum of $19,933.64.

"Column 20, shows the balance remaining unpaid November 25, 1925, of all items listed in Exhibit A of Exhibit 1 as doubtful after applying the collections as set out in Column 18 and notes written up as set out in Column 19 and totals $148,263.89.

"Column 21 sets out certain increases referred to in Column 10 and certain increases in part only referred to in Column 10 subsequent to December 20, 1922, and aggregates an amount of $17,185.83. That is on the theory that the payments received should be applied first to the payment of any additions to these lines covered by the guaranty after the guaranty was given.

"Column 22 shows the total unpaid November 30, 1925, after applying Column 21. It amounts to $165,449.72."

We find it unnecessary to go into deductions claimed and denied, which were of minor and also large amounts, totaling $82,551.64. While the auditor testifies that the balance remaining unpaid November 30, 1925, "of the total line, without regard to whether doubtful or not, including increase, as shown by the liability ledger, aggregates the amount of $256,943.33," it is, on his report and testimony,—i. e., on applicants' own showing,—a matter of speculation as to how much in detail, on a trial of the question of fact, could be proved to the satisfaction of a jury as a liability under the guaranty. Applicants' request of their accountants for names of witnesses is unanswered.

Applicants assert in argument that:

"Counsel for the appellee Andrew have argued somewhat at length with reference to there being some doubt as to following the notes, and says that we did not in our evidence show that all of the notes were renewals. That is not true. All of the notes are renewals except approximately $28,000, all of which was covered heretofore in our argument. The burden is on them to show, and not upon us; and when we have shown that these notes are still the property of the bank, and show that these are renewals, by the numbers as they appear in the audit of Billings, Prouty & Tompkins, that is sufficient, so far as this case is concerned. All that counsel's argument amounts to is an attempt to throw dust in the air, to try and confuse the issue."

This is the only reply made by applicants to the argument of the appellees, based upon the accountants' report of the difficulty to determine which of the now open notes are renewals of notes guaranteed, and the impossibility of forming "a dependable conception of what amount of guaranty notes were open on any date very far removed from December 20, 1922." On the report of applicants' accountants, and on this argument, it would be very venturesome on the part of the court to endeavor to fix a sum which might reasonably be expected to be recoverable.

The court had undoubted authority to authorize a compromise. *Knaffl v. Knoxville Bank & Tr. Co.*, 139 Tenn. 240 (201 S. W. 775); 7 Corpus Juris 737; *State v. Bank of Rushville*, 57 Neb. 608 (78 N. W. 281); *State v. German Sav. Bank*, 65 Neb. 416 (91 N. W. 414). See *Sherman v. Linderson*, 204 Iowa 532. It is for the applicants, who are attacking it, to show good cause to set the settlement aside. The court should be slow to renounce the right of the great majority of the depositors to the $36,000, for the mere possibility of recovering a larger sum. It should at least be made to appear reasonably probable that the renunciation of the settlement would inure to the benefit of the depositors.

Applicants stress an agreement by the defendants by which, at one time, they agreed to contribute some $81,000 toward $110,000 that was to be raised from the stockholders, the amounts which the signers of the guaranty were thereby to pay being much larger than those they are required to pay under

. the approved settlement. For some days preceding the closing of the bank, an effort was being made to consolidate the Farmers & Merchants State Bank with a national bank. The national bank was making objections to the paper of the Farmers & Merchants State Bank. As we understand the record, the stockholders of the Farmers & Merchants State Bank, in order to effect the consolidation, agreed to raise $110,000, of which $81,000 was to be contributed by the directors, and the directors signed notes aggregating that amount. These notes were taken by the examiner, but the proposed consolidation failed, and the notes were returned to Mr. Morrison, the attorney. The examiner says that they were taken ''with the understanding that they would be turned in to this other bank, if they would accept them and the consolidation went through. Well, it didn't go through, and I was bound by my agreement with these directors to return them to them; and so, when I left, I turned them over to Mr. Morrison, as my agent, to take charge of them and return them to the makers.'' A proposed assessment on stockholders was agreed to. On the evening after the bank closed, the directors met, and charged off $189,600 of the notes set out in the guaranty. We need not be detained with a discussion of the validity of this action, under the guaranty. These proceedings were taken evidently in the effort to effect the merger, which did not fail until early the following morning. Defendants might be willing to contribute $81,000 on such terms as were agreed upon in order to keep the bank going, and avert from themselves and the public the calamity of closing. They might also, for that purpose, accept an assessment. Such willingness is no evidence of legal liability to the bank, either on the guaranty or as recalcitrant officials; nor does the amount of the expenditures which they were thus willing to make throw any light on the amount of the notes which, when they signed the guaranty, and continuing to the time of the settlement, were within its terms.

The depositors' meeting, held shortly after the bank closed, appointed a committee of five, ''to employ attorney to investigate this whole matter.'' This apparently was before any question came up about the guaranty, and, so far as appears, before its existence was known to the depositors. The commit-

tee employed Mr. Charles C. Clark, of Burlington, who spent a day in investigation, and reported:

"The officers were in pretty bad shape, and it didn't look like the depositors could get anything to amount to anything."

One of the committee testifies:

"He said, if we could get anything out of it, we had better take it, and not go to court. He said he would report to the attorney-general immediately."

It is not shown that the depositors made any investigation, by attorney or otherwise, into the proposed settlement, further than that the committee consulted with Mr. Morrison, who seems to have been representing the directors and acting as local attorney for the banking department, or for the attorney-general. Mr. Morrison recommended the settlement to the committee. He said that "$36,000 was all he could get of the signers." The committee evidently did not know what the responsibility of the signers was. They were told that suit could not be brought until the three years were up, which would be a year later, December 20, 1925. The directors had been making transfers of their property. They appear to be badly involved financially, and the extent of their responsibility was a matter of doubt. One of the committee testifies that Mr. Morrison told him, "if we got into litigation, it would take two or three years to get it disposed of. I was depending on you [Morrison] for pretty good authority. Q. And you were in favor of settling the matter, weren't you? A. I was in favor because you insisted. I had confidence in you, and relied on your judgment. I also relied on what Mr. Clark had told me. Jones, the bank examiner, was there, too, and he had been working upon" the settlement, "and advised us that he thought it was a good settlement, and we better take it, instead of carrying it into court." Another member of the committee testifies:

"I was at all times in favor of having the matter settled, and avoiding litigation. * * * I considered it better for the depositors, after that meeting, to take the 40 per cent, than to wait nearly a year and then begin the litigation. * * * Each of the members expressed himself to the effect that it would be the best to get the matter settled and to get the money, rather than have the delays and a question regarding this Exhibit 1."

Another member says that they were led to believe that it would not bind the depositors; that the agreement to the settlement was merely their own individual consent to it; and that they stated that the committee had no authority to sign on behalf of the depositors. He testifies:

"The discussion as to what these men would be worth was a discussion as to what they would be worth, or what could be collected from them, at the end of a lawsuit, if we went through two or three years' litigation. * * * I absolutely believe that, in signing the consent, we did the best possible thing for the depositors, and I would sign it again tomorrow, on the same proposition."

He says that, in a measure, he was acting somewhat on Mr. Clark's advice. As has been stated, none of the depositors except the five appear to be objecting; but the court is asked to take from them the certainty they now have, on the hazard of their recovering more at the end of a lawsuit.

Without further particularizing, we are of the opinion that it is not shown to be in the interest of the depositors to set aside the settlement.

The applicants charge fraud in the settlement. The advisability of the compromise was tried in this proceeding *de novo*. Fraud or mistake in the original approval cannot affect the determination here. Fairness to those charged with the fraud demands brief attention. The charge is based largely upon Mr. Morrison's dual employment, and the absence of knowledge of the banking department of the financial ability of the directors. Mr. Morrison is not shown to have been acting in the interest of the directors at the expense of his other clients, nor his influence to have been determinative in making the settlement. The general examiner of the banking department in charge of the receiverships recommended the settlement. His knowledge at the time was not as complete as it was at the time of the trial. He says that, if he had felt that the guaranty could have been enforced without question, he would not have made a settlement. He did not have any doubt as to the signers' being good for any judgment that might be obtained. He says that he would still recommend the settlement. He admits that his information was different at the time of the trial from that when he recommended the settlement, and that, if he

had then known what developed at the trial, he says, "if I had known that they were liable for the entire line, that would have made some difference in my recommendations to the court in connection with the settlement." On the evidence here, the general examiner would be as much in the dark as to the extent of the directors' liability as he was when he made his recommendations. Charge of fraud further is based upon the fact that the approval by the depositors' committee had appended to their names their designation as committee, while they testify that in signing they were acting individually. Neither in this nor in any other particular do we find any evidence of fraud.

The court reserved to the receiver authority at his option to sue on officers' and stockholders' liabilities, and provided that, if he brought no suit within 50 days, then any creditor, stockholder, or depositor might sue. The findings authorized such suit "under the theory" of a common-law liability or a statutory liability. The rights of depositors outside of the guaranty are thereby protected.

We are of the opinion that the approval of the settlement was a proper exercise of the authority and discretion of the court, and the order appealed from is—*Affirmed.*

EVANS, DE GRAFF, ALBERT, and KINDIG, JJ., concur.

WAGNER, J., not participating.