PURE OIL CO. et al. v. STATE ex rel. JOHNSON, State Bank Com'r.

No. 27316.     April 9, 1940.

Rehearing Denied Dec. 17, 1940.

Application for Leave to File Second Petition for Rehearing Denied April 1, 1941.

*111 P. 2d 494.*

Alvin Richards and Poe, Lundy & Morgan, all of Tulsa, and Hayes, Richardson, Shartel, Gilliland & Jordan, of Oklahoma City, for plaintiffs in error.

Houston E. Hill, of Oklahoma City, Johnson & Jones, of Bristow, and Glen O. Young, of Sapulpa, for defendant in error.

BAYLESS, C. J. This is an appeal from the district court of Creek county and involves the merits of an action prosecuted by the Bank Commissioner of Oklahoma for the benefit of the depositors

an insolvent bank, against the Pure Oil Company, a corporation, et al.

The action was first filed by the State of Oklahoma on relation of Wm. H. Murray, Governor, but on appeal we held that the Bank Commissioner was the proper party plaintiff. See State ex rel. Murray v. Pure Oil Co., 169 Okla. 507, 37 P. 2d 608.

When the matter had been remanded to the district court, the Bank Commissioner filed an amended petition and named Pure Oil Company, a corporation, Royalty Corporation of America, a corporation, John C. Ellinghausen, E. A. Ellinghausen, First National Bank of Tulsa, a corporation, and H. L. Payne as defendants.

The amended petition contained three causes of action, the first two being designed to procure the vacation of two certain orders of the district court of Creek county, case No. 18598, in the matter of the liquidation of the affairs of the insolvent bank; the third cause of action sought an accounting from the Pure Oil Company (hereinafter referred to as Pure) and the Royalties Corporation of America (hereinafter referred to as RCA) for the value of certain stocks which the Bank Commissioner contended belonged to the Supulpa State Bank (hereinafter referred to as Bank) and for which stocks Pure and RCA allegedly failed to account to Bank.

At the conclusion of the trial plaintiff was permitted to amend his petition to conform to the proof by alleging in substance that neither Pure nor RCA had ever taken steps to foreclose their purported liens, but on the contrary had converted the securities r e f e r r e d to above to their own use.

The answers of defendant denied generally the allegations of plaintiff and relied upon the two orders of the court referred to above as constituting a defense to plaintiff's cause of action, and also other defenses unnecessary to enumerate herein. A summarized statement of the evidence is hereinafter set out:

Pure owned a producing oil and gas lease. RCA owned a part of the royalty interest therein. Litigation concerning the title to the leased land arose, and Pure began to withhold payment of the royalty until the title should be settled. It intended to hold the royalties until the litigation was terminated, but it did not intend to pay interest on the money so held.

W. E. Brown was president of RCA and John G. Ellinghausen was secretary and treasurer. John G. Ellinghausen was also vice president of the Bank.

We think a fair inference of the evidence introduced warrants the statement that Bank and RCA agreed that if Bank would pay RCA 3 per cent. interest on the funds RCA would try to make an arrangement with Pure whereby the funds would be invested in interest-bearing securities. RCA denies that they had any such agreement, but does admit that they agreed upon the rate of interest to be paid.

Thereafter Bank induced Pure to part with these impounded and future royalty funds upon the following basis: Bank and its officers, as individuals, executed an indemnity bond to Pure conditioned: "* * * they and each of them will save harmless * * * Pure * * * from and against all and every loss, cost, or damage, charge or expense * * * which * * * Pure * * * may suffer or incur by or on account of the delivering to the said principal, or to whomsoever the said principal may direct, the proceeds of the oil. * * *" Pure agreed in return to deposit the funds covered in First National Bank, Tulsa, Okla., to the credit of Bank. Bank further agreed to pledge with Pure, securities acceptable to it, of a value equal to each deposit made. In this manner Bank obtained the royalty funds, and Pure had an indemnity bond and securities to protect it against loss if it should be determined the funds accruing to the royalty interest and paid out for the benefit of RCA did not belong to RCA. As between RCA and Bank it was agreed that Bank should credit to RCA

interest at the rate of 3 per cent., and RCA should not attempt to withdraw the funds and interest credits until the litigation involving the lease was ended in favor of RCA. Contemporaneous therewith, RCA executed a t r a n s f e r order directed to Pure authorizing Pure to pay the royalty funds accruing to RCA from this lease to Bank. There was no written contract embodying this three-cornered agreement, nor any substantial part of it. All of this must be gathered from such written instruments as have been referred to, and to letters, checks, and other writings passing between the parties, and from their conduct. RCA's president testified that the arrangement was made by Pure and Bank, and that his company had nothing to do with it. However, it is clear that RCA knew what was being done, participated in a part of the negotiations, executed some instrument, and made no protest if it was dissatisfied.

Pursuant to this arrangement, and from time to time beginning with March 30, 1928, Pure issued its checks, representing the royalty accrued to RCA's interest, payable to Bank and delivered these checks to First National Bank, Tulsa, Okla. Each time such a deposit of money was made by Pure, the First National Bank would purchase securities acceptable to Pure in an amount substantially equal to the amount of the deposit, and hold these separately for Pure, and Pure left these securities at the First National Bank for safekeeping. Charges were made against Bank's general deposit for the purchase. Custody receipts were issued by the First National Bank to Pure, and these securities were regarded as being completely under the control of Pure. Later, at Bank's request, duplicate custody receipts were sent to it by Pure. The making of these deposits and pledges continued for about 18 months, and the amount of the royalty so deposited amounted to approximately $154,000, and the value of the securities pledged approximately equaled t h a t sum.

First National Bank was a correspondent bank for Bank, and the latter main-

tained in the former a general deposit of assets. As promptly as the checks issued by Pure to the credit of Bank were received by First National Bank, it deposited said c h e c k s to the credit of Bank's general account. When these deposits were made, deposit slips were sent to Bank, which then set up on its records credits for a similar sum. Then Bank would enter like deposits upon its records in favor of RCA, and would send RCA deposit slips. RCA would then show upon its accounts receivable similar credits. Thus there was a regular, complete bookkeeping record on the part of all concerned of these royalty payments. No special directions were issued for the handling of these checks or the funds represented thereby, nor was any objection made to the method of handling the matter as outlined. As interest accrued on the deposits entered on the records of the Bank, it was credited to RCA in a separate account. RCA was advised of the interest credits and entered similar credits upon its records. However, Pure denied any knowledge of how the Bank and RCA handled the bookkeeping, and the evidence does not disclose any knowledge on its part.

The last deposit seems to have been made by Pure about September 21, 1929. Shortly after this the pending litigation over title to the lease was decided in favor of Pure and RCA. However, no immediate steps were taken to have Pure return the securities pledged, or to withdraw the deposit from Bank because the parties were awaiting the mandate of the court's decision in the title litigation.

About November 27, 1929, the Bank Commissioner of Oklahoma declared Bank to be insolvent, as authorized by our statutes, and took possession of the assets and affairs of the Bank for the purpose of liquidating them.

In December, 1929, in pursuance of an agreement between Pure and RCA, Pure withdrew the securities from First National Bank and delivered them to RCA, and it in turn gave Pure an indemnity bond to protect it against loss for having

delivered said securities to it, and further agreed to procure from the district court of Creek county an order approving this disposition of the securities.

Between the time Bank closed its doors and March 5, 1930, there ensued a series of investigations, negotiations, and conferences between RCA, on the one hand, and the Bank Commissioner, the liquidating agent, and the depositors committee, on the other hand, respecting the status of deposit and the securities. All of the parties were aware of all that had been done, or had access to the records disclosing what had been done. The only fact above related unknown to the Bank Commissioner was that Pure had turned the securities to RCA, but in view of the agreement they reached we think this is largely immaterial.

It is clear from this record that all of the parties mentioned in the preceding paragraph believed that the deposit in Bank was special and preferred, that Bank did not receive title to the money realized from the checks, that the securities did not belong to it (or should be turned to RCA, if they in fact did belong to Bank, in settlement of the preference). None expressed a contrary view. It is equally clear that the parties recognized that Bank had title either to the deposit or securities, or that there was such a record respecting these that an order of the district court approving the transfer of the securities was advisable in order to definitely settle the relations of the parties.

By statute, secs. 9180 and 9183, O. S. 1931, the settlement of bad or doubtful debts or the sale of property of a failed bank by the Bank Commissioner is valid if approved by the district court or a judge thereof of the county wherein the failed bank is located.

The Bank Commissioner caused to be prepared a petition to be presented to the district court of Creek county for the approval of the disposition of the matter.

H. L. Payne, cashier of the failed Bank, executed a waiver of the notice provided by section 9180, supra, and on March 5, 1930, the petition above mentioned was presented to a judge of said district court, and an order was made approving the transfer of the securities.

RCA then furnished Pure a transcript of these proceedings, in keeping with their agreement, for the purpose of evidencing a release of Pure from responsibility or liability. Upon examination of the proceedings Pure decided they were not legally sufficient. It doubted that the petition was sufficiently definite to inform the judge of what he was to pass upon, and doubted the order was broad enough. Pure then prepared, and filed March 13, 1930, a pleading in the nature of a plea in intervention, asking approval of the agreement made. It caused written notice of the filing thereof to be served upon Bank as provided by section 9180, supra, and also to be served upon the Bank Commissioner. The Bank Commissioner filed an answer. March 19, 1930, E. A. Ellinghausen called the matter to the attention of another judge of the district court of Creek county, the judge who signed the order of March 5th being absent. This judge signed an order, which will be quoted later.

Later in this opinion, in the discussion of the law applicable, we will elaborate upon certain of the statements above made. But for the time being we believe that these serve to give a fairly understandable outline of what transpired.

Nothing further seems to have been done on this matter until May 28, 1932, when Governor Murray instituted the action mentioned earlier. In other words, two years, two months and nine days elapsed between the last order and the bringing of the action. Pleadings were filed and issues joined, and proceedings had as heretofore mentioned.

At the conclusion of the trial of the issues joined, the trial court rendered judgment in favor of the plaintiff and against the Pure and RCA, and they bring this appeal.

In substance the trial court found the previous court orders void and that Pure and RCA converted to their own use the securities belonging to the Sapulpa State Bank.

Various contentions are made by the parties, but we think that the various propositions may be narrowed to one question, to wit: Were the orders of the district court of Creek county res adjudicata?

As a premise to inquiring whether the orders were valid we must determine what is the nature of the function performed by the district courts or the judges thereof in approving settlements of bad or doubtful debts, or sales of assets of the failed bank. We have said that no such settlement or sale is valid or effectual without such approval. National Surety Co. v. Sand Springs State Bank, 74 Okla. 176, 177 P. 574. In other words, such a settlement or sale consists of two distinct parts: (1) The agreement of the Bank Commissioner, and (2) the approval of the district court or a judge thereof of the county wherein the failed bank is located. Therefore, the question is: In passing upon the application for approval of a settlement or sale, is the district court or a judge thereof acting judicially in a judicial proceeding, or is he merely acting ministerially in an administrative proceeding supervising in an executive matter?

The issue arises upon the conflicting contentions of the parties respecting the nature of the orders of March 5th and 19th or similar orders. Defendants contend that each of the orders is in effect a formal, final, and conclusive judgment in the fullest sense. On the other hand, plaintiff contends that these orders do not partake of the nature of judgments, but, on the contrary, that the district judges of this state act simply as ministerial officers (tantamount to county judges approving deeds of restricted Indians) in passing upon such matters, and that such orders may be attacked at any time, upon any ground available. Plaintiff's argument is virtually summarized in the language of the Supreme Court of Missouri in Cornet v. St. Louis County (Mo.) 240 S. W. 107, as follows:

"The rendition of a judgment having all the incidents of judicial finality, by a court while acting simply as a legislative agent * * * has no other or greater force than the act of a nonjudicial agent of the legislative department. * * *"

The authority and duty of the Bank Commissioner in the liquidation of a failed bank, and the supervisory power of the district courts or judges thereof, and the matters wherein supervision was required or permitted, as it existed at the times herein mentioned, are to be found in chapter 40, art. 6, O. S. 1931.

Generally, it may be said that exclusive power to close a bank, and to take possession of its assets, and to liquidate all of its affairs is vested in the Bank Commissioner. The Bank Commissioner is directed to file "with the court of the county, in which the said bank is located, a complete statement setting forth in detail all receipts and disbursements" for certain periods (section 9173, O. S. 1931), and upon the order of the district court of the county in which it is doing business, may sell or compound all bad or doubtful debts, and on like order, may sell all its real and personal property" (section 9174, O. S. 1931); and, upon taking possession of a failed bank, he shall make an inventory of its assets in duplicate, one to be filed in his office and "one in the office of the court clerk of the county in which the said bank was doing business, and the court clerk of said county shall give such case a number on the district court docket," and upon the expiration of the time for filing claims he shall make a list of the claims filed, specifying the ones rejected, in duplicate, and shall file "one in the office of the court clerk in the county in which the bank was located," and that the Bank Commissioner is authorized to pay all expenses of the liquidation "subject to the approval of the district court or a judge thereof" (section 9176, O. S. 1931). He is authorized to pay periodical

dividends, and after one year a final dividend in such amount, to such persons, upon such notice "as may be directed by the district court or a judge thereof." Further, "objections to any claim not rejected by the commissioner may be made by any party interested by filing a copy of such rejection with the commissioner, who shall present the same to the district court or a judge thereof at the time of the next application to declare a dividend. The court thereupon shall make such order as is necessary in allowing or disallowing such claim or any part thereof." (Section 9177, O. S. 1931). He may pay any prior liens or claims against the bank "after having procured the authority so to do by the district court or a judge thereof of the county in which said bank was located" (section 9179, O. S. 1931). Section 9180, O. S. 1931, material to this action, reads:

"None of the assets of any such failed bank shall be sold, or bad and doubtful debts compounded by the Bank Commissioner, except on the order of the district court, and the failed bank must be notified of the hearing on any such application before any such district court or a judge thereof for at least five (5) days prior to such hearing. Such notice may be served by any person and a service be made on the persons designated by law to receive service on a banking corporation."

Section 9183, O. S. 1931, reads:

"The Bank Commissioner shall take possession of the books, records and assets of every description of such bank or trust company, collect debts, dues and claims belonging to it, and upon order of the district court, or judge thereof, may sell or compound all bad or doubtful debts, and on like order may sell all the real or personal property of such bank or trust company upon such terms as the court or judge thereof may direct, and may, if necessary, pay the debts of such bank or trust company, and enforce the liabilities of the stockholders, officers, and directors: Provided, however, that bad or doubtful debts, as used in this section, shall not include the liability of stockholders, officers or directors."

This summarized statement of some of the powers and duties of the Bank Commissioner that are affected by the supervisory power vested in the district courts discloses that the statutory scheme of supervision by the courts is not stated in sufficient detail to render intelligible the exact views of the Legislature in this respect. It cannot with certainty be stated whether an action or a special proceeding (section 8, O. S. 1931, 12 O. S. A. 3) should be filed, that would require some observance of due process in the acquirement of jurisdiction, the service of process, etc. In section 9176, supra, a list of the assets is required to be filed in the "office of the court clerk," who shall give "such case a number on the district court docket." The use of the word "case" is isolated, there being no other use of the word or the word "action" or the term "special proceeding" elsewhere in the sections. There are numerous acts the Bank Commissioner can perform on his own official discretion unfettered by the supervision of the local district court. The court has construed certain of the sections mentioned, and has authorized appeals, and apparently has approved a course of departmental construction which consists of the filing of an action or special proceeding whereby the judicial power of the court is challenged in respect to those matters over which the district courts have some control.

Our decision in Yeargain v. Shull, 149 Okla. 221, 300 P. 303, gives more consideration to the nature of the court's acts in passing upon the matters that are submitted by the Bank Commissioner than any other decision of this court that has come to our attention. We pointed out that the Legislature had given a part of the judiciary the power to supervise the agents of the executive branch of our government. Upon consideration of the matter, we concluded therein that the power exercised by the district courts or the judges thereof was equitable in character and therefore wholly judicial. We adhere to that conclusion because it has heretofore been determined that the policy expressed in our Constitution that there be a separation of the powers of the

three independent branches of our government prevented the Legislature conferring a legislative or executive power or duty upon the courts of this state. In re Opinion of Judges, 25 Okla. 76, 105 P. 325; and In re Commissioners, 22 Okla. 435, 98 P. 557.

In Yeargain v. Shull, supra, and Mothersead v. Harris, 148 Okla. 285, 298 P. 602, we held that the Bank Commissioner acted in the capacity of a receiver in liquidating the affairs of an insolvent bank, and the analogy between these proceedings and the receivership is almost complete, the sole difference being the source of authority.

We now begin a consideration of some of the principles of procedure that ought to govern the district courts or judges in considering the matters that are authorized to be submitted to them in relation to these liquidation proceedings. It appears from what other courts have had to say upon this that a real responsibility is thus imposed upon them, and they are not to be made lightly or treated as a matter of course. The opinion in Re Provo Commercial & Savings Bank, 95 Utah, 366, 81 P. 2d 644, is a complete exposition of the duty resting upon a court or judge in these matters, and we desire to quote portions of that opinion:

"* * * But in the case of the approval of an offered compromise, the court has the duty of determining whether or not the debt should be compromised. * * *

"The trial court itself recognized the necessity of a factual basis for judgment. He stated: 'This petition being in the nature of a petition to compromise a claim of course places before the court for investigation the value of the property involved. * * *'"

At another place it is said:

"* * * Even in the case where the court has the duty of approving compensation of employees, under section * * * he is not a mere factotum. * * * In the latter case, * * * the court said: 'Still, in approving or disapproving the compensation or expenses as fixed by the commissioner the court is required to do something more than merely put his "rubber stamp" on the report approving or disapproving it.' * * * Unless the court is permitted to inquire into such or similar matters and questions, the statute requiring approval by the court is meaningless."

This decision will be quoted later in that part of this opinion where we analyze the pleadings and hearing when the orders attacked were entered.

The Supreme Court of Missouri discussed this matter at some length in Baynes v. Bank (Mo. 1938) 118 S. W. 2d 1051, and said:

"As used in the statute the words 'approved' and 'approval' must be considered in at least two connections—first, with the duty of the court, and second, in connection with the word 'fix'. * * * But as applied to a court whose duty it is to supervise, in a large measure, the liquidation of a state bank within its jurisdiction, the words do not contemplate the court's approval as a purely ministerial act or duty. The words as used here call for the exercise of judicial discretion and determination, a hearing and judgment by the court passing on the matter before it. * * *

"In passing on fees or expenses 'fixed' or allowed by the Commissioner of Finance the trial court is not a mere 'rubber stamp.' * * *"

As pointed out in Hulse v. Argetsinger, 18 Fed. 2d 944, the proceedings are somewhat informal, but "The judge remains free to get such information as he can from any sources. * * *"

Having thus determined what is the source of the court or judge's authority and duty in passing on these matters, and having seen that a real responsibility is thus imposed, let us examine what was done. What was done appears from pleadings that speak for themselves respecting their contents and scope, and from the testimony of the attorney who appeared on March 5, and March 19, 1930, and from the testimony of the respective judges who signed the orders. There is little dispute between the parties as to what actually transpired at these dates, the contention being re-

stricted to their differing views of the legality thereof.

The Bank Commissioner, who was fully aware of all of the facts and contentions of the parties and who was willing to settle with Ellinghausen and to release (or sell) the securities to RCA, caused to be prepared and filed a petition reading:

"That heretofore and on, to wit: the 27th day of November, 1929, the Sapulpa State Bank, a corporation of Sapulpa, Oklahoma, was by order of the Bank Commissioner of the State of Oklahoma, declared and adjudged to be an insolvent institution, and that since the said 27th day of November, 1929, all of the assets of said bank have been in the hands of the Bank Commissioner of the State of Oklahoma for liquidation and settlement.

"Petitioner would further show the court that John G. Ellinghausen of Sapulpa, Oklahoma, is and was the owner of thirty-five (35) shares of capital stock of said bank; that the said John G. Ellinghausen, at the time said bank was declared insolvent, and is now, indebted to said bank in the following amounts (items totaling $23,676.61).

"Together with any and all other liabilities not herein shown, and owing by the said John G. Ellinghausen to The Sapulpa State Bank.

"Your petitioner would further show the court that John G. Ellinghausen is heavily involved and that your petitioner belives that it is impossible for the said John G. Ellinghausen to liquidate his said indebtedness to this bank in full, and that the said John G. Ellinghausen has agreed to borrow certain moneys to make settlement in full of all of his liabilities including his double stock liability, and that your petitioner believes it is to the best interests of the said bank, and the depositors and creditors of the said bank, that a settlement be made with the said John G. Ellinghausen.

"Petitioner would further show the court that said bank was the escrow holder of certain moneys deposited by the Royalty Corporation of America, and the Pure Oil Company, a corporation, all of Tulsa, Oklahoma, in the First National Bank, a corporation, of Tulsa, Oklahoma, which moneys were and are the property of the Royalty Corporation of America and the Pure Oil Company, and in which moneys the Sapulpa State Bank disclaims any and all right, title, equity and interest.

"Petitioner would further show the court that the Royalty Corporation of America has agreed to purchase from the Bank Commissioner of the State of Oklahoma as trustee for the Sapulpa State Bank, all the liabilities herein set out and due and owing by the said John G. Ellinghausen to the said Sapulpa State Bank for a cash consideration of ten thousand ($10,000) dollars and the release of any claim by Royalty Corporation of America against the Sapulpa State Bank on account of interest unpaid on said escrow account or claim for shrinkage on bonds securing said escrow account.

"Petitioner would further show the court that in said proposition of purchase so made by the Royalty Corporation of America the double liability on stock so held by the said John G. Ellinghausen in the Sapulpa State Bank is paid in full.

"Your petitioner would further show the court that he believes that it is to the best interest of said bank, the depositors and creditors of said bank that the proposition so made to it by the Royalty Corporation of America be accepted, and that he be authorized to transfer, sell and assign to the Royalty Corporation of America, or its nominee, all of said notes and liabilities of the said John G. Ellinghausen, as aforesaid, and that the same be, by the court, ratified, confirmed and approved."

On the same day this petition was filed, there was filed a waiver of the service upon the Sapulpa State Bank of the notice required to be served by section 9180, O. S. 1931. This waiver was signed on behalf of the Sapulpa Bank by its cashier, upon his own initiative. On the same day, to wit, March 5, 1930, a judge of the district court of Creek county signed an order reading:

"This matter coming on for hearing on this 5th day of March, 1930, upon the petition and application of C. G. Shull, Bank Commissioner of the State of Oklahoma, as trustee and successor in in-

terest of the Sapulpa State Bank, a corporation, of Sapulpa, Oklahoma, an insolvent institution, for an order approving the sale of certain notes and liabilities due and owing to the Sapulpa State Bank by John G. Ellinghausen of Sapulpa, Oklahoma, to the Royalty Corporation of America, of Tulsa, Oklahoma, at and for a price of ten thousand ($10,000) dollars and waiver of claim by the Royalty Corporation of America against the Sapulpa State Bank for accrued interest on the principal of certain escrow funds and shrinkage on bonds securing said escrow deposit belonging to the Royalty Corporation of America and the Pure Oil Company and deposited by them in the First National Bank of Tulsa, Oklahoma.

"And the court being well and sufficiently advised in the premises and on consideration thereof finds that said proposition of settlement so made between C. G. Shull, Bank Commissioner of the State of Oklahoma, as trustee and successor in interest of the Sapulpa State Bank, and the Royalty Corporation of America wherein and whereby Royalty Corporation of America pays to the Sapulpa State Bank the sum of ten thousand ($10,000) dollars and waives all claim had by said corporation against the Sapulpa State Bank for and on account of accrued interest and depreciation in bonds arising from the deposit of certain moneys by the Royalty Corporation of America and the Pure Oil Company in escrow in the First National Bank of Tulsa, Oklahoma, for all notes and liabilities owing to the Sapulpa State Bank by the said John G. Ellinghausen, be and the same is hereby in all things ratified, confirmed and approved.

"The court further finds that all double liabilities on account of the ownership of thirty-five (35) shares of capital stock of the Sapulpa State Bank by the said John G. Ellinghausen, has been paid in full by the said Royalty Corporation of America in the sale and settlement as aforesaid.

"The court further finds that the said C. G. Shull, Bank Commissioner of the State of Oklahoma, as trustee and successor in the interest of the Sapulpa State Bank, disclaims any and all right, title, equity and interest in and to that certain escrow deposit hereinbefore referred to and set forth.

"It is therefore, ordered, adjudged and decreed, by the court, that the settlement and sale by C. G. Shull, Bank Commissioner of the State of Oklahoma, of the notes and indebtedness due and owing by John G. Ellinghausen to the Sapulpa State Bank and so sold and assigned to the Royalty Corporation of America, be and the same is hereby in all things ratified, confirmed and approved and the said C. G. Shull, Bank Commissioner of the State of Oklahoma, is hereby authorized to transfer and set over to the Royalty Corporation of America all of the notes and liabilities of the said John G. Ellinghausen to the Sapulpa State Bank, and is hereby ordered and directed to disclaim and release to the Royalty Corporation of America all right, title, interest or claim that the Bank Commissioner may nor/or hereafter have in and to said escrow deposit made by the Royalty Corporation of America and the Pure Oil Company in First National Bank of Tulsa, Oklahoma."

The record shows that the petition just quoted did not fully inform the district court of Creek county or the judge thereof respecting the status of the money, or the securities, or the legal positions of the parties, and Pure seems justified in declining to accept it as a release.

The district judge to whom the matter was presented testified as follows concerning the signing of the order:

"A. * * * It was a long time ago and there is a great deal of it, the details of which I am not familiar, but in substance it was this: Some question was asked about whether court was in session. I don't remember anything about that but I do know that Mr. Edwin Ellinghausen presented that petition and order for me to sign, and I took the petition, and whether I read it and went into it particularly, I can't say only as a matter of habit I generally try to inform myself of things I sign and approve. But I do remember very well that I had a rule requiring all settlements to be approved by the depositor's committee. They had a depositor's committee in which I had explicit confidence, headed by Judge George L. Burke. I looked in the petition and found it was not signed

by them. Since examining this petition, it is my judgment that that page was in that petition and that there were no signatures to it and I objected to taking any further proceedings because the depositor's committee had not signed and approved it and that entered into a discussion between Mr. Ellinghausen and I. He went ahead to tell me that Hoy Harsha had sent that up; that he was merely acting for him; that this matter had been gone into with the depositor's committee and the Bank Commissioner, but he gave me some reason why their signatures wasn't there. He wanted it approved that day. Now, it is really my opinion—I was led to believe—that Earl Brown was the fellow that was putting up the $10,000 in cash and just like Mr. Jones' question, it is barely possible that Mr. Ellinghausen gave that excuse for having that signed without the signatures of the depositor's committee because he wanted it done while Mr. Brown was still in the notion. Anyway, it strikes me that Mr. Ellinghausen gave me his personal assurance that it was satisfactory with the depositor's committee, and that if I approved it he would see that they would come in and sign it later. He convinced me that it was approved by and satisfactory to the depositor's committee. With the promise to me that he would have them sign it— of course, I knew their signatures had no legal effect—I went ahead and approved it."

When RCA procured a transcript of these proceedings and delivered it to Pure as evidence of the release of Pure from further responsibility or liability, Pure refused to accept the same as evidence of its release on the ground that it was not legal or sufficient. One of the reasons assigned by Pure was that the cashier of the failed bank had no authority to waive the service of the notice required by statute. Thereupon, Pure undertook to procure an order protecting it, and prepared and filed a petition in intervention, containing the following:

"* * * And as such Bank Commissioner on or about the 27th day of November, 1929, issued an order declaring and adjudging the Sapulpa State Bank to be an insolvent institution and that since said 27th day of November, 1929, all of the assets of said Bank have been in the hands of the Bank Commissioner of Oklahoma for liquidation and settlement.

"Your petitioner would further show the court that among the records of said failed institution was an account styled 'Royalty Corporation of America and The Pure Oil Company;' that said account was in the savings department of said bank and was created by a deposit of funds in the First National Bank of Tulsa, Oklahoma, by the Pure Oil Company, to cover royalties belonging in fact to the Royalty Corporation of America, arising out of the proceeds from the sale of oil from a lease, part of which royalty was owned by the Royalty Corporation of America; that said fund was created between the period of March 3, 1928, down to and including September 21, 1929, the total amount of which was $153,772.92; that at the time of the making of these deposits a charge was made by the First National Bank against the account of the Sapulpa Bank for approximately the same amount of each deposit, and the proceeds therefrom invested in bonds or commercial paper and thereafter held by the First National Bank of Tulsa, Oklahoma, for the Pure Oil Company, to secure said account.

"Petitioner would further show the court that said bonds or commercial paper or proceeds thereof upon maturity of such bonds or commercial paper were at all times held by the Pure Oil Company to secure it against loss by reason of payment of the royalties aforesaid, which were accumulating from lands upon which litigation was pending.

"Your petitioner would further show that the litigation over said lands from which said royalties arose has been terminated and the Pure Oil Company is desirous of turning over to the Royalty Corporation of America all deposits, moneys, bonds or commercial paper which it holds as security as above set forth, and be relieved of all charges and liability of every kind and character.

"Your petitioner would further show that heretofore, and on the 5th day of March, 1930, in the proceeding entitled as above, the court made its order approving the sale of said notes and liabilities due and owing to the Sapulpa State Bank by John G. Ellinghausen and in consideration thereof it was ordered by the court that the Sapulpa

State Bank, acting by and through its trustee and successor in interest, C. G. Shull, Bank Commissioner of the State of Oklahoma, disclaim and release to the Royalty Corporation of America all right, title, interest or claim of the said Sapulpa State Bank or the Bank Commissioner of the State of Oklahoma, as such trustee, may now or hereafter have in and to said escrow deposit or the bonds, commercial paper or funds derived therefrom. A copy of said petition, waiver of notice and order is hereto attached, marked Exhibits 'A', 'B' and 'C', respectively, and made a part hereof.

"Your petitioner would further show that it is informed and believes that settlement has been made between the Royalty Corporation of America and C. G. Shull, Bank Commissioner, as authorized in said proceeding, and in consideration of same, the Bank Commissioner of the State of Oklahoma, as trustee and acting for the Sapulpa State Bank, has agreed to the release of said escrow deposit or stocks, bonds, notes or proceeds arising therefrom and held by your petitioner, and to release and relieve of all liability to the said Sapulpa State Bank or its successor in interest, all right, title, interest or claim as against said fund or The Pure Oil Company.

"Petitioner would further show that said escrow deposit or bonds or commercial paper or proceeds arising therefrom are no part of the assets of the Sapulpa State Bank, and that the agreement heretofore made and set out herein is proper and should be approved by this court.

"Wherefore petitioner prays that the court issue its order herein directed to the Bank Commissioner of the State of Oklahoma, and to the Sapulpa State Bank directing them on or after five days from date hereof to appear and show cause why this court should not upon hearing herein enter its order approving the settlement herein set out and specifically authorizing and directing the release of said moneys, bonds or stocks now held by your petitioner and be forever relieved and discharged of and from all liability to the Sapulpa State Bank, its depositors or creditors, or anyone acting for said Sapulpa State Bank, as above set forth."

It thereupon caused notice to be served upon the Bank, as required by law, and also upon the Bank Commissioner. The latter prepared and filed, on March 16, 1934, an answer reading:

"Comes now C. G. Shull, the duly qualified and acting Bank Commissioner of the State of Oklahoma, and for answer to the petition filed in the above-entitled cause, says that he issued an order on or about the 27th day of November, 1929, declaring the Sapulpa State Bank to be an insolvent institution; that since said 27th day of November, 1929, all of the assets of said bank have been in the hands of the Bank Commissioner of Oklahoma, for liquidation and settlement, to pay the depositors and creditors of said insolvent institution.

"Defendant, C. G. Shull, further alleges that the district court of Creek county issued an order on the 5th day of March, 1930, based upon his petition covering the John G. Ellinghausen settlement and other things more fully set out in said order; a copy of same is hereto attached, marked Defendant's Exhibit 'A' and made a part of this answer.

"Defendant, C. G. Shull, further answering, alleges that exhibit A, attached hereto and made a part of this answer only binds the Banking Department of Oklahoma, insofar as it can be strictly construed from the terms and conditions set out therein, and that he does not know about the litigation pending, whereby the Pure Oil Company and Royalty Corporation of America are interested, or whether the same is settled or not, as the Banking Department was not at any time a party to said litigation or interested in same, and further that if the Banking Department has any claim against the Pure Oil Company which could arise from any of the facts now known in connection with this action, or any facts that could come up later, said defendant, C. G. Shull, Bank Commissioner of Oklahoma, specifically objects to any order of the court, barring the Banking Department of Oklahoma from further claims against the Pure Oil Company, or any other parties interested herein.

"Wherefore, petitioner prays that upon hearing of this action by the court that only such orders be made by the court as will in law and equity be justi-

fied, and further that no order be made by the court that will in any manner bar or bind the Banking Department from prosecuting any claims it may now have or hereafter have in connection with the matters and things set forth in petitioner's petition."

On March 19, 1930, Mr. E. A. Ellinghausen again appeared on the matter of the petition and notice of Pure Oil Company, and the answer of the Bank Commissioner, but was unable to find the judge who signed the previous order. He thereupon took the matter up with another judge of said district court, who, after hearing Ellinghausen's statement, signed an order dated March 19, 1930, reading:

"This matter coming on for hearing on this 19th day of March, 1930, upon the petition and application of the Pure Oil Company for an order herein approving the settlement set out in the petition, specifically authorizing and directing the release of certain moneys, bonds, stocks or proceeds upon maturity of same, and to forever release and discharge the Pure Oil Company from all liability to the Sapulpa State Bank, its depositors and creditors, or anyone acting for it, growing out of an escrow deposit belonging to the Royalty Corporation of America and deposited by Pure Oil Company in the First National Bank of Tulsa, Oklahoma, prior to the failure of the Sapulpa State Bank, and the court, being well and sufficiently advised in the premises, and on consideration thereof, finds that C. G. Shull, Bank Commissioner, and the Sapulpa State Bank have had due and timely notice of the hearing of this petition, in accordance with the statutes of the State of Oklahoma.

"The court further finds that among the records of the failed institution was an account styled 'Royalty Corporation of America and the Pure Oil Company,' that said account was in the savings department of said bank and was created by the deposit of funds in the First National Bank of Tulsa, Oklahoma, by the Pure Oil Company to cover royalties belonging in fact to the Royalty Corporation of America, arising out of the proceeds of the sale of oil and gas from a lease, part of which royalty was owned by the Royalty Corporation of America, the title of which lease was in litigation.

"The court further finds that said fund was created between March 3, 1928, up to and including September 21, 1929, the total amount of which was $153,772.92; that at the time of the making of these deposits a charge was made by the First National Bank against the account of the Sapulpa State Bank for approximately the same amount of each deposit, and the proceeds therefrom invested in bonds or commercial paper and such bonds or commercial paper was thereafter held by the First National Bank of Tulsa, Oklahoma, for the Pure Oil Company to secure said account.

"The court further finds that heretofore, and on March 5, 1930, in a proceeding entitled as above, this court made its order approving the sale of notes and liabilities due and owing to the Sapulpa State Bank by John G. Ellinghausen to the Royalty Corporation of America, in which action and in said agreement it was ordered by the court that the Sapulpa State Bank, acting by and through its trustee and successor in interest, C. G. Shull, Bank Commissioner of Oklahoma, disclaim and release to the Royalty Corporation of America all right, title and claim of the said Sapulpa State Bank, or the Bank Commissioner of the State of Oklahoma as such trustee, which it may now or may hereafter have in and to said escrow deposit or the bonds, commercial papers or funds derived therefrom; that the fund referred to therein is the same fund which is now held by the Pure Oil Company, above referred to, and which is this proceeding it desires to turn over to the Royalty Corporation of America and be specifically relieved of all liability or charges of every kind or character.

"The court further finds that said agreement relative to the indebtedness of the said John G. Ellinghausen to the Sapulpa State Bank has been finally closed and settled, and that it is right and proper that an order should be entered herein approving said settlement, and authorizing the release of said fund or moneys to the Royalty Corporation of America as prayed for in the petition herein.

"It is therefore considered, ordered, adjudged and decreed by the court that the settlement of the indebtedness of John G. Ellinghausen to the Sapulpa State Bank be and the same is hereby

in all things ratified, confirmed and approved; that the escrow deposit or fund held by the Pure Oil Company, as hereinbefore set forth, which fund consists of moneys, bonds, stocks, or proceeds from the sale thereof, is hereby directed to be paid over to the Royalty Corporation of America, and that upon receipt of said fund the Pure Oil Company shall be forever relieved and discharged of and from all liability to the Sapulpa State Bank, its depositors, stockholders or creditors, or the Bank Commissioner of the State of Oklahoma, or any one acting for the Sapulpa State Bank."

The judge to whom the second order was presented testified as follows concerning the signing of the order:

"* * * I think that I did ask him if this matter had been presented to the Bank Department and if Mr.Harsha had made an investigation of the matter and if he could be present or if he was coming down or something like that and he told me he would try to get hold of Mr. Harsha, and he did leave the courtroom, I presume, to call him; I don't know about that. Later he came back and informed the court that Mr. Harsha did not care to come down; that he did not care to be present and Mr. Ellinghausen informed the court that Judge Speakman had heretofore made an order upon a petition of the Bank Department in which the same matters were involved. And, that, as I recall it, it has been a long time ago, he told me that the oil company had objected to the order made by Judge Speakman for the reason that it wasn't full enough and that this order he was asking me to make was to cure the defects in the order made by Judge Speakman and from that statement and upon the petition I signed the order."

It seems that shortly after these orders were made some critical comment was published in a local newspaper, and it was of such a character as to cause the judge who made the order of March 5th to take notice, and likewise the judge who signed the order of March 19th. It appears that these judges then had separately a series of conversations with various officials of the Banking Department and persons interested in the bank, on the matter. A hearing was then had by one of the judges upon his own initiative on the matter. He called in witnesses and conducted an informal investigation that satisfied both himself and the other judge that there was no basis for the rumors being circulated, and they took no steps to undo the orders.

We are of the opinion that the Bank Commissioner had authority to enter into negotiations to compromise or settle the claim of the Bank against John G. Ellinghausen. He had cause to do this, since he considered it bad or doubtful in the sense that Ellinghausen was unable to pay in full, and therefore negotiations were in order that as much as possible could be realized from Ellinghausen. The petition filed by the Bank Commissioner called attention to the general purpose of all of the parties interested in the settlement of that matter as well as the settlement of the matter of the supposed deposit on the records of the Bank and the ownership and right to the possession of the securities that Pure had delivered to RCA. Whether it was as full and complete as it could have been made is largely immaterial, since, as pointed out in Hulse v. Argetsinger, supra, the judge remained free to obtain information from such sources as he desired. It likewise was largely immaterial because Pure filed its petition later in explanation of the matter, and in all events the district judges' jurisdiction and attention were challenged. The district court of Creek county or the judges thereof had power and jurisdiction in the premises.

We think the rule is that orders made by district courts or the judges thereof in these matters are judgments in the sense that they finally dispose of the matters. State ex rel. v. National City Bank, 56 Ohio App. 401, 11 N. E. 2d 93; In re Supt. of Banks, 207 N. Y. 11, 100 N. E. 428; Love v. Allard (Tex. Civ. App.) 286 S. W. 581; Henderson, Supt., v. Farmers Sav. Bank, 199 Iowa, 156, 200 N. W. 581; Andrew, Supt., v. F. & M. Bank, 205 Iowa 353, 218 N. W. 520; State ex rel. Spellman v. Platte Valley Bank, 128 Neb. 562, 259 N. W. 643; Upham v. Bramwell, 105 Ore. 597, 209 P. 100; State ex rel. v. Nemaha County, 124 Neb. 883, 248 N. W. 650; Shubert v. Andrew, 205 Iowa, 353, 218 N. W. 78; Leach v. City Bank, 207 Iowa,

1254, 219 N. W. 496; and State ex rel. v. State Bank (Neb.) 251 N. W. 99. Appeals are permitted, Little v. State ex rel., 142 Okla. 126, 285 P. 967. In some of the cases it is pointed out that these orders remain subject to the control of the court during term time, and may be vacated on motion or by other statutory methods.

There seems to us to be an analogy in these matters to the finality given to orders in tax ferret proceedings (Ford Motor Company v. State, 178 Okla. 193, 62 P. 2d 48), rulings on omitted property assessments (Ford Motor Co. v. State, supra), and departmental rulings on income and other tax matters. Champlin v. Oklahoma Tax Commission, 163 Okla. 185, 20 P. 2d 904, and Seminole v. Gulf, 168 Okla. 136, 32 P. 2d 43. In all of those instances we have held that a hearing and determination thereof is final, where no appeal is taken, because there is a final adjudication of the issue.

It is true that we pointed out in Yeargain v. Shull, supra, that there was a continuing equitable jurisdiction in the district courts that permitted them to adjust the equities of the parties affected by these orders, but it is in this very particular that we think the plaintiff failed.

In order successfully to attack one of these orders made and unappealed from, some equitable showing must be made, such as fraud or other equitable grounds. Yeargain v. Shull, supra. The plaintiff herein began the proceeding on the assumption that there was fraud and collusion between the parties whereby the approval of the settlement was to be obtained from the court without a full and complete disclosure and by concealment and misrepresentation. It is significant that the persons who perpetrated the fraud in part, if there was fraud, were made defendants, and were dismissed from the action before judgment. It may be said at once that the charge of fraud and collusion failed of proof utterly, and that the plaintiff does not now seriously contend there was any such fraudulent conduct. He contends now at most that the judges who passed on the matters were not fully advised by the parties, and that their orders were entered injudi-ciously and without the making of the fullest investigation, and without exercising discretion; and, that the orders were erroneous as a matter of fact and law and would not have been made had the judges been fully advised or had adequately investigated the matter.

We recognize the wholesomeness of the rules of duty, stated in the decisions cited, devolving upon the district courts or judges in passing on these as well as all matters submitted to their scrutiny. But after all, it calls only for the exercise of a judicial discretion, and when such showing has been made that satisfies the court or judge, and induces the exercise of his discretion to approve or disapprove, it will require a greater showing than has been made herein to cause us to find that there was an abuse of judicial discretion by the judges who heard these matters. Both of the judges who considered the matter testified at the trial of this case, and their testimony discloses that they did not treat the pleadings as mere formalities, nor did they pass upon the things therein presented without some questioning of the purposes and motives of the parties and some effort to be informed in order that they could act upon information. In this respect, we repeat, plaintiff can only assert that if a long drawn out investigation had been made and a similar hearing held, the judges might have learned something that might have induced them to withhold approval. With the record before us we cannot give weight to this contention. All of the parties involved were fully and equally informed, and all of them had equal access to all of the facts. We are not convinced that a longer or more searching investigation would have led the judges to a different conclusion. We do not think any of the parties would have deliberately withheld information. Our judgment is that all of these parties were of the same mind respecting the status of the so-called deposit and the ownership of the securities, because they were all acting upon the same information. They did not think there was other or additional information that was helpful or likely to change the views they all held. We think the information upon

which all of the parties acted, and particularly the consideration given to the settlement by those depositors or creditors of the bank who were consulted, and the motives that induced them to reach their unanimous approval of the proposed settlement are disclosed in the testimony of Mr. R. L. Wilkinson, an attorney and a member of the depositor's committee:

"Well, the matter was first called to my attention by Mr. Harsha, I think, when the settlement was being considered by him to accept ten thousand dollars in settlement of the Ellinghausen liabilities. His proposition was that he would be able to secure a ten thousand dollar settlement of the Ellinghausen liabilities by releasing the bank's claim to these securities and insisted that the legal rights of the bank be determined before such a settlement was made. I insisted that he get an opinion from the attorneys for the Bank Department. I also asked Mr. Grigsby and Mr. Payne, in dealing with this account, how this account and the securities were handled. I also read the letters and communications that Mr. Harsha received from the Bank Department at Oklahoma City and I also considered Mr. Ellinghausen's ability to pay his liabilities. And, all in all, I finally agreed with them that it was an advantageous settlement. We also figured this, I don't know whether correctly or not that if the bank took the position that it was entitled to these securities, it would lose on the depreciation of the value of these securities. It would have to account to the oil company for this one hundred and fifty-four thousand dollar deposit. They would receive their prorata share of the assets and would also have to account to them for the interest and if we lost in our contention, the litigation for the claim to these securities would ultimately result in also losing the ten thousand dollars, and that it would probably result in an ultimate loss to the depositors."

In other words, the contrary view now urged by the Bank Commissioner constitutes a change of views respecting the legal effect of the same facts; the facts are the same—the mind of a later official differs from that of the earlier official and from the views then held by others interested. The record discloses that all of those interested in the distribution of the assets of the Bank were highly in favor of the settlement and were extremely anxious to have the benefit of the $10,000 that was to be paid in for Ellinghausen. We say, again, we doubt that a prolonged hearing would have produced a different order.

We are satisfied that the rule announced in Shubert v. Andrew, supra, that a mistake of law is not a ground for vacating these orders otherwise than by appeal or by motion according to the rules of practice, is the proper rule. As said therein, appeals and motions to vacate while the court yet had control of its orders are proper methods to attack such orders on the ground of error of law because they are judgments. To hold according to the contention of the plaintiff would mean that there never would be any finality in the orders made by the courts or judges on these matters, but that the official discretion of one Bank Commissioner and the approval of an incumbent judge would be subject to be revised, modified, or vacated by their successors in office. We cannot believe this was the intention of our lawmakers in providing for and prescribing the method of liquidating the affairs of an insolvent state bank.

The judgment of the trial court is reversed and the cause is remanded to the district court of Creek county, with directions to render judgment in favor of the defendants.

WELCH, V. C. J., and OSBORN, HURST, and DAVISON, JJ., concur. RILEY, CORN, and GIBSON, JJ., absent. DANNER, J., not participating.